## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                    Case No.:  2:05-cr-65-FtM-29SPC

CLEMENT MCDOWELL

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Defendant Clement McDowell's Motion to Suppress (Doc. #167) filed on February 22, 2007.  On March 20, 2007, a hearing was held on the Defendant's Motion to Suppress.  The Government was represented by Assistant United States Attorney David Haas and the Defendant was represented by Attorney David J. Joffe, Esq.  The Government called Sergeant Mike Masiero and Sergeant Jay Rodriguez as witnesses.  The Government introduced the Defendant's Waiver of Miranda Rights Form (Gov't. Exhibit 1), the Competence Evaluation of Dr. Paul S. King, Ph.D. (Gov't. Exhibit 2), and the Competence Evaluation of Dr. Jorge Luis, Ph.D. (Gov't. Exhibit 3).

The Defendant called the Defendant's estranged wife Tessa McDowell and introduced the psychological evaluation of Dr. Jethro Toomer, Ph.D. (Defense Exhibit 1)  The Defendant also requested that the hearing be held open for ten (10) days in order to supplement the record with the Defendant's record from the Ruth Cooper Center dated August 18, 2007.[1]  (Doc. S-3).  In addition,

---

[1]      The Defendant's supplemental materials were filed with the Court on March 30, 2007.

the Defendant also noted that he might wish to reopen the proceedings to subpoena the sheriff's deputies who transported him to the Ruth Cooper Center on August 18, 2007. [2]

## TESTIMONY AND EVIDENCE

**Sergeant Mike Masiero**: (Tr. 9-35).

Sgt. Masiero has served with the Fort Myers Police Department (FMPD) since 1992. He currently serves as supervisor in charge of the FMPD's detective bureau. On August 18, 2005, Sgt. Masiero was a member of the DEA Joint Task Force working undercover narcotics details. (Tr. 9:24, 10:1).

On August 18, 2005, the FMPD was involved in the roundup of individuals indicted after a lengthy narcotics investigation. (Tr. 11:1-5). According to Sgt. Masiero, the Defendant was one of the individuals sought in the roundup, which he said began about 5:00 a.m. (Tr. 11:14-16). The Officers went to the address that they believed to be the Defendant's residence but he was not home. (Tr. 11:20-25, 12:1). Later in the evening, Sgt. Masiero was informed that the Defendant had self-surrendered at the FMPD headquarters around 10:30 p.m. (Tr. 12:13-18).

Sgt. Masiero testified that he went down to the FMPD headquarters and met with the Defendant in the lobby. (Tr. 13:1-11). Sgt. Masiero arrested the Defendant and took him upstairs to an interview room. (Tr.12:24-25, 13:1-3). The Defendant was not handcuffed when he was taken into custody. (Tr.23:8-10). Sgt. Masiero read the Defendant his Miranda rights from the official Miranda Rights Form used by the FMPD. (Tr. 15:10-22; Gov't. Exhibit 1). The Defendant signed the form in Sgt. Masiero's presence and agreed to speak with him. (Tr.14:8-17, 17:23-25). Sgt. Jay

---

[2]To date, no request to reopen the proceedings has been filed, and the time to do so has since expired.

Rodiriguez witnessed the Defendant sign the form. (Tr. 14:16-17, 17:12-16).  Sgt. Masiero testified that he did not have any knowledge that the Defendant was Baker Acted that day, or taken to the Ruth Cooper Center. (Tr. 13:12-17).  Sgt. Masiero further testified that he had no access to the Defendant's medical records prior to or during the Defendant's interview. (Tr. 13:18-21).  The Defendant never mentioned anything about having a mental illness or having any mental problems to Sgt. Masiero prior to or during the interview. (Tr. 24:11-16).

Regarding the actual interview, Sgt. Masiero stated that the Defendant was cooperative and appeared to understand everything that was said to him. (Tr. 16:2-8).  The Defendant was alert and coherent and did not appear to be intoxicated. (Tr. 20:13-18).  The Defendant never requested an attorney. (Tr. 18:16-18).  In fact, Sgt. Masiero testified that the Defendant wanted to sign the form and tell what he knew. (Tr.20:19-24). Sgt. Masiero stated that the Defendant was "enthusiastic" about the interview.  (Tr.20:19-24).  No force or promises were used to coerce the Defendant into talking with the officers.  (Tr. 20:25, 21:1-2 ). Sgt. Masiero had no hesitation about conducting the interview with the Defendant. (Tr. 21:3-6).  However, Sgt. Masiero did state the Defendant seemed a little hyper and anxious but could not classify his behavior as manic. (Tr.  27:14-25).  The Defendant inquired at least on three occasions if the officers had seen his wife cheating on him during any of their surveillance activities. (Tr. 28:6-10, 29:3-14).  Nevertheless, the information from the Defendant was flowing so fast that Sgt. Masiero had to interrupt at times to ask specific questions. (Tr. 24:17-25).  The information provided by the Defendant was confirmed by other intelligence  the Detectives possessed relating to the case. (Tr. 33:1-8).  The interview concluded after about 20 to 25 minutes. (Tr.24:7-10).

**Sergeant Jay Rodriguez**: (Tr. 35-47).

Sgt. Rodriguez has served with the FMPD for the last eight years.  On August 18, 2005, he was serving as a detective in the Narcotics Division assigned to the DEA. (Tr. 36:5-8).  On August 18, 2005, Sgt. Rodriguez participated in a roundup for Operation Dunbar. (Tr. 36:19-24).  The Defendant was one of the individuals sought in Operation Dunbar. (Tr. 37:6-8).  The officers did not locate the Defendant during the day's round up. (Tr. 37:14-16).  Around 10:00 p.m , Sgt. Rodriguez received a call that the Defendant was in the lobby of the FMPD building desiring to self-surrender. (Tr. 37:23-25, 38:1-7).

Sgt. Rodriguez called Sgt. Masiero and then proceeded to the FMPD where they met the Defendant. (Tr. 38:8-14).  Sgt. Rodriguez and Sgt. Masiero arrested the Defendant and took him upstairs to an interview room. (Tr. 39:16-22).  The Defendant was not handcuffed after he was arrested. (Tr. ).  Once upstairs, Sgt. Masiero read the Defendant his Miranda rights from the form. (Tr. 40:18-20, Gov't. Exhibit 1).  Sgt. Rodriguez observed the Defendant sign the form and then signed the form himself as a witness. (Tr. 40:18-25, 41:1-14).  Sgt. Rodriguez testified that the Defendant was paying attention to what they were telling him, he was lucid, coherent, and gave no indication that he did not understand his rights. (Tr. 41:15-23).

The Defendant was cooperative during the course of the interview, which lasted only about 45 minutes. (Tr. 42:3-5, 43:9-12).  The Defendant was not handcuffed and no threats or promises were made to coerce the Defendant's responses. (Tr. 42:13-25).  The Defendant did not appear impaired in any way, he was calm but full of energy, and appeared lucid with a lot to say. (Tr. 42:8-12). The Defendant was not disheveled. (Tr. 44:5-8).  At no time did the Defendant ask for an Attorney nor did he state that he wished to stop the interview. (Tr. 43:13-17). The Defendant had

a wealth of information to share and talked very fast. (Tr. 43:20-23).  Sgt. Rodriguez never got the impression that the Defendant did not understand what was going on during the interview. (Tr. 44:2-4).

**Tessa McDowell**: (Tr. 48-74).

McDowell has known the Defendant for fourteen (14) years. (Tr. 48:13-14).  She is currently married to the Defendant, however, they are separated at this time and McDowell stated that she is seeking a divorce. (Tr. ).  McDowell and the Defendant have five (5) children together. (Tr. 49:14-18).  McDowell testified that she first noticed  the Defendant had mental health issues when he was about seventeen (17) years of age. (Tr. 50:3-7).  McDowell testified that she would observe the Defendant talking to himself as though he were in a conversation with another person. (Tr. 50:8-11).

On August 17, 2005, the Defendant told McDowell that he was going out to buy a pack of cigarettes. (Tr. 51:15-19).  McDowell went to sleep around 10:30 p.m. and was awakened around 2:40 a.m. by the sound of the garage door opening and closing over and over. (Tr. 52:7-19).  According to McDowell, the Defendant told her he was being followed and that someone had a red light shining on him. (Tr. 53:18-25, 54:1-2).  The Defendant then searched the residence for the rest of the night acting like someone was in the house. (Tr. 54:7-15).  The Defendant also said someone was trying to steal his car. (Tr. 54:16-19). The alarm in the vehicle kept going off, he would go turn it off, and the alarm would subsequently sound again.(Tr. 55:6-12).  The Defendant finally cut the battery cables to his car. (Tr. 54:17-20).  McDowell testified that the Defendant was actually the one setting off the alarm but did not realize he was doing it. (Tr.55:11-15).

The next day, August 18, 2005, the Defendant took her car keys from her and would not let her leave the house. (Tr. 56:5-11).  The Defendant would not explain why she could not leave. (Tr.

56:12-13).  McDowell called her father to pick up the children and take them to the bus stop and then

called 911.  (Tr. 56:15-21).  Two officers arrived and McDowell explained that the Defendant was

a paranoid schizophrenic.  (Tr. 57:15-25, 58:1).  The officers attempted to speak with the Defendant

through the door but he would not open the door for them.  (Tr. 58:2-9).  Finally, one of the officers

used a tool and opened the door.  (Tr. 58:2-9).  The Defendant kept telling the officers to check the

attic because he believed someone was hiding in his attic.  (Tr. 58:16-21).  After speaking with the

Defendant, the officers transported the Defendant to the Ruth Cooper Center.  (Tr. 59:1-7).

The Defendant called McDowell around 3:00 p.m that afternoon.  (Tr. 59:20-25, 60:1-4).

According to McDowell, the Defendant was aware that the Marshals were looking for him and that

he tried to call them to come and pick him up.  (Tr. 60:24-25, 61:1-2).  Finally, around 8:00 p.m. that

evening she and her mother picked the Defendant up at the Howard Johnson's in North Fort Myers.

(Tr. 62:5-18, 63:13-14).  The Defendant told McDowell that the Marshals were up in the trees

surrounding the hotel and that he was going to get in the pool with his hands up and make them come

and get him.  (Tr. 64:20-25).  At the time she found him, he was only wearing his boxers and it

appeared to McDowell that he had been in the pool.  (Tr. 63:21-25, 64:1-11).

After an hour and a half at the Howard Johnson's, McDowell drove the Defendant to the

FMPD station arriving there around 10:30 p.m.  (Tr.65:21-25, 66:1-22).  Two officers came out and

said they were looking for the Defendant.  (Tr. 67:11-14).  McDowell stated that she could not

identify the officers and did not know if Sgt. Masiero and Sgt. Rodriguez were the officers who came

and placed the Defendant in custody. (Tr.67:15-25).  She testified that neither she nor her mother told

Sgt. Masiero or Sgt. Rodriguez about the Defendant's problems from earlier in the day.  (Tr. 68:10-

17). McDowell testified that she did not know -if the Defendant was on any medication when he self-surrendered. (Tr. 69:13-16).

**Supplemental Medical Records Ruth Cooper Center**: (S-3).

On March 30, 2007, the Defendant filed with the Court his medical records from the Ruth Cooper Center.  The supplemental records include the Lee County Sheriff's Department report from the officers who responded to the McDowell residence, and the opinion of the examining physician at the Ruth Cooper Center dated August 18, 2005.  The transporting officers notes  indicate the Defendant was transported to the Ruth Cooper Center for alleged irrational and violent behavior. (Supplemental Record S-3 at 6).  Dr. N. Kamnik, M.D. examined the Defendant at Ruth Cooper. Dr. Kamnik's progress notes state the Defendant's thoughts were clear and organized. (Supplemental Record S-3 at 5). Dr. Kamnik signed the Defendant's Approval of Release From Involuntary Status From the Receiving Facility at 10:30 a.m on August 18, 2005. (Supplemental Record S-3 at 8).   On the release form, Dr. Kamnik noted that there were less restrictive treatment alternatives available for the Defendant's condition. (Supplemental Record S-3 at 8).  The Defendant was subsequently released from the Ruth Cooper Center.

## DISCUSSION

The Defendant argues that any post <u>Miranda</u> statements he made on August 18, 2005, or August 19, 2005, should be suppressed because he was unable to understand his <u>Miranda</u> rights and therefore, could not voluntarily waive his rights.  The Government argues that the officers were unaware of the Defendant's mental condition and therefore, they could not have exploited the situation to coerce the Defendant into violating his <u>Miranda</u> rights.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed., 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).  Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444.  A person need only be informed of his Miranda rights if he is in custody and is being interrogated.  Id. at 478-479.  Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444.  The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 110 S. Ct. 1682 (1980).

In this instance, it is undisputed that the Defendant was in custody and that he was read his Miranda rights prior to being questioned.  The issue is whether or not, due to his alleged mental condition on August 18, 2005, he was capable of freely and voluntarily waiving his Miranda rights. There is a two part inquiry into whether or not a defendant's waiver of Miranda rights was voluntary, knowing, and intelligent. U.S. v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)(citing Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Barbour, 70 F.3d at 585.  "Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id.  "Only if the totality of the circumstances

surrounding the interview reveal an uncoerced choice and the requisite level of comprehension may

a court properly conclude that the <u>Miranda</u> rights have been waived." <u>Id.</u>

The Court will begin with the first prong of the test to determine if the Defendant's waiver

of his <u>Miranda</u> Warning was voluntary.  "The fact that a defendant suffers from a mental disability

does not, by itself, render a waiver involuntary; there must be coercion by an official actor."<u>Id.</u> (citing

<u>Colorado v Connelly</u>, 479 U.S. 157, 169-170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986).  Thus, the

fact that the Defendant may have had a mental illness does not by itself render his statements

involuntary. <u>Barbour</u>, 70 F.3d at 585.  For the waiver to be deemed involuntary, Sgt Masiero and Sgt.

Rodriguez would have had to taken advantage of the Defendant's alleged mental illness in some

manner to coerce a statement.

In this instance, Sgt Marieso testified that they had no prior knowledge of the Defendant's

alleged mental problems. (Tr. 13:12-21, 24:11-16).  Neither officer had any prior knowledge of the

Defendant's visit to the Ruth Cooper Center that morning. (Tr. 13:12-17).  Furthermore, McDowell

testified that she did not communicate any of the incidents that took place earlier that day to either

Sgt. Masiero or Sgt. Rodriguez. (Tr. 68:10-17).  Instead, the officers testified that the Defendant was

coherent, alert, lucid and eager to tell them his information. (Tr. 20:13-24, 42:18-12).  No testimony

was presented that would indicate the officers in this case knew of the Defendant's mental problems

and then attempted to use that information to coerce incriminating statements from him.

Turning to the second prong of the analysis, the Court must determine whether or not the

Defendant was fully aware of both the nature and the consequences of the decision to abandon his

<u>Miranda</u> rights.  The Defendant argues that he was incapable of being aware of the consequences of

his waiver due to his mental incapacities.  However, as noted above, the fact that a defendant suffers

from a mental disability does not, by itself, render a waiver involuntary. <u>Barbour</u>, 70 F.3d at 585.

In this instance, the Defendant has been reviewed by two forensic psychiatrists, Dr. King (Gov't. Exhibit 2) and Dr. Luis (Gov't. Exhibit 1), who both found that he had the mental ability to understand the charges against him and was competent to stand trial. The Defendant's own expert, Dr. Jethro W. Toomer, PhD. opined that the Defendant has sufficient capability to consult with counsel, and has a reasonable degree of rational and factual understanding of the proceedings against him. (Defense Exhibit 1). These medical reports, although provided after the waiver, are strong indicators to the Court that the Defendant was also able to understand and comprehend his <u>Miranda</u> waiver on August 18, 2005. The records provided Ruth Cooper Center from August 18, 2005, demonstrate that the Defendant's thoughts were clear and organized. (Supplemental Record S-3 at 5).

The testimony provided at the hearing also supports a conclusion that at the time of the August 18, 2005, interview the Defendant was in control of his faculties. The Defendant was read a <u>Miranda</u> rights waiver form and freely signed it. (Tr. 16:2-8, 20:13-24, 41:1-23). Sgt. Masiero testified the Defendant was cooperative and appeared to understand everything that was said to him. (Tr. 16:2-8). The Defendant was alert and coherent and did not appear to be intoxicated. (Tr. 20:13-24). Sgt. Rodriguez testified that the Defendant was paying attention to what they were telling him, he was lucid, coherent, and gave no indication that he did not understand his rights. (Tr. 41:15-23). The information the Defendant provided during his statement was accurate and confirmed by the other intelligence the officers had regarding the narcotics investigation as a whole. (Tr. 33:1-8). While the Defendant seemed anxious, Sgt. Masiero testified that he never seemed manic but rather he was enthusiastic about telling his story. (Tr. 27:14-25). Even the Defendant's own evidence from

the Ruth Cooper Center indicates that Dr. Kamnik found the Defendant's thoughts to be clear and organized. (S-3).   Therefore, based upon the totality of the circumstances surrounding the Defendant's waiver, the Court respectfully recommends that the Defendant was fully aware of the rights he was waiving, the consequences of that waiver, and freely, knowingly, and voluntarily waived his <u>Miranda</u> rights.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant Clement McDowell's Motion to Suppress (Doc. #167) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___5th___ day of April, 2007.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record

-11-